The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOSE F. AYON,<br><br>    Plaintiff,<br><br> vs.<br><br><br>LINCARE INC., a Delaware corporation, QP3 TRAINING SYSTEMS, INC., a Florida corporation, and TED DOE, an individual,<br><br>    Defendants. | Case No.: C05-0808C<br><br>ORDER |

I.   INTRODUCTION

This matter has come before the Court on Defendants' motions for summary judgment. (Dkt. Nos. 28, 31.) Having carefully considered the papers filed by the parties, the Court has determined that no oral argument shall be necessary. For the reasons that follow, the motions are GRANTED in part and DENIED in part.

ORDER - 1

## II. FACTUAL BACKGROUND

Plaintiff was employed by Defendant Lincare, first as a service representative/delivery driver, and then as a sales representative. As part of his job duties as a sales representative, Plaintiff was required to attend and satisfactorily fulfill formal sales training classes. It was Plaintiff's participation in one of these formal sales training classes that gives rise to Plaintiff's claims in this action.

In April 2002, three months after he had been promoted to the sales representative position, Plaintiff was sent to St. Louis, Missouri, to take a two-week sales training class offered by Defendant QP3. Defendant QP3 is in the business of providing customized training programs for its clients. QP3's Lincare program was developed by Brian Anderson (QP3's chief executive officer) and Ed Williamson (the QP3 representative who co-taught the class attended by Plaintiff) in collaboration with Lincare personnel.

Plaintiff's complaint alleges that at the St. Louis training, Ed Williamson singled him out for "adverse attention and poor treatment" because of Plaintiff's ethnicity. (Am. Compl. ¶ 3.6.) The alleged bad treatment included "making adverse comments about or relating to Hispanic names and people" (Am. Compl. ¶ 3.6(b)), "[i]nsulting [Plaintiff] after [he] asked him to change the illustrations and examples he was using by stopping references to Hispanic people and names" (*id*. ¶ 3.6(c)), and "[s]tating to [Plaintiff] and to others that [Plaintiff] was unintelligent, unskilled, and unlikely to pass the written tests included in the program" (*id*. ¶ 3.6(d)).

Plaintiff claims that the alleged harassment triggered a nervous breakdown related to his bipolar disorder and that he had to leave the program one day early and without completing his final assignment.

Plaintiff reported to work as normal on April 15, 2002. His immediate supervisor, Wendell Bellah (also the individual who had helped Plaintiff get the promotion to sales rep), spoke to Plaintiff about the training program. After a conversation lasting between 1½-2 hours, Mr. Bellah informed Plaintiff that he was terminated.

ORDER - 2

Plaintiff left Defendant Lincare's office, but did not make it home. Instead, he drove to a friend's home, whereupon he was taken to a hospital and hospitalized as suffering an acute manic episode. Plaintiff remained hospitalized for two weeks.

After Plaintiff's condition had stabilized, he sought to be reinstated at Lincare. He claims that his final expense reimbursement request was accompanied by a note requesting that he be reinstated. Plaintiff also claims that his doctor wrote to Lincare on his behalf. Defendant Lincare asserts that it never received either of these letters. Indeed, the letters are absent from Plaintiff's personnel file. Whatever the case, Lincare did not reinstate Plaintiff's employment.

Plaintiff now sues Defendant QP3 and Defendant Lincare pursuant to the Washington Law Against Discrimination ("WLAD") for alleged discrimination on the basis of national origin and for failure to accommodate his disability. Plaintiff also asserts claims against Defendant QP3 for the negligent hiring and negligent supervision of Ed Williamson.

III. ANALYSIS

    *A.    Summary judgment standard*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248. The moving party bears the burden of
ORDER - 3

showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

### B.     Defendant QP3

Plaintiff seeks to impose liability on QP3 as the employer of Ed Williamson for Mr. Williamson's allegedly discriminatory behavior. Plaintiff's amended complaint also seeks to hold Defendant QP3 liable for the torts of negligent hiring and negligent supervision of Mr. Williamson. Defendant QP3 moves for summary judgment on all of these claims.

As a preliminary matter, the Court notes that Plaintiff did not respond to QP3's motion with respect to the negligent hiring and negligent supervision claims. Although the Court may infer from Plaintiff's failure to respond that he concedes that these claims are meritless, *see* Local Rules W.D. Wash. CR 7(b)(2), out of an abundance of caution, the Court will briefly analyze the claims.

In order to prevail on his claim for negligent hiring, Plaintiff must show that QP3 knew, or in the exercise of ordinary care, should have known of Mr. Williamson's unfitness at the time of hiring. *Lester v. Town of Winthrop*, 939 P.2d 1237, 1242 (Wash. Ct. App. 1997). Plaintiff offers no evidence or argument pertinent to this necessary element of his claim. Plaintiff does not even allude to the existence of such evidence. The record now before the Court shows that Mr. Williamson had known QP3's chief executive, Brian Anderson, for a long time, and that Mr. Anderson knew that Mr. Williamson had had a successful career and an extensive teaching history. Accordingly, because Plaintiff has failed to show that there is any genuine issue of material fact about QP3's knowledge of Mr. Williamson's alleged unfitness, the Court finds that QP3 is entitled to summary judgment on Plaintiff's negligent hiring claim. Plaintiff's negligent hiring claim is DISMISSED.

ORDER – 4

Plaintiff's claim against QP3 for negligent supervision suffers from a similar fatal deficiency. Negligent supervision claims address an employer's liability for an employee's acts outside the scope of his or her employment. A necessary element of a claim for negligent supervision is that the employer knows or should have known that the employee presented a risk of danger to others. *Thompson v. Everett Clinic*, 860 P.2d 1054, 1059 (Wash. Ct. App. 1993). Again, Plaintiff neither provides nor even alludes to the existence of any evidence that would raise a genuine issue of material fact as to QP3's knowledge. Indeed, the Court notes that student response to Mr. Williamson's teaching, as documented in class feedback forms, was overwhelmingly positive. For these reasons, the Court does not find that there is any genuine issue of material fact that QP3 was aware or had any reason to be aware that Mr. Williamson's performance was unsatisfactory, much less presented a risk of danger to others. Accordingly, the Court finds that QP3 is entitled to summary judgment on Plaintiff's negligent supervision claim. Plaintiff's negligent supervision claim is DISMISSED.

Plaintiff also seeks to hold Defendant QP3 vicariously liable for the acts of Mr. Williamson. An employer may be held liable for the wrongful acts of an employee if those acts were within the scope of the employee's employment. *Kuehn v. White*, 600 P.2d 679, 681 (Wash. Ct. App. 1979).

> The test in Washington for determining whether the employee was, at any given time, in the course of his employment, is whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, or by specific direction of his employer; or as sometimes stated, whether he was engaged at the time in the furtherance of the employer's interest.

*Dickinson v. Edwards*, 716 P.2d 814, 819 (Wash. 1986).

Although the employee himself need not have a judgment of liability against him,[1] the plaintiff must show that the alleged acts in fact occurred and that they were wrongful.

---

[1] Although Defendant QP3 argues that the employee must himself be found liable in order for liability to attach to the employer, the authority it cites in support of this proposition states only that in order to hold an employer liable for discrimination on a negligent supervision claim, the plaintiff must first establish that she was subjected to discrimination. *Herried v. Pierce County Pub. Transp. Benefit Auth. Corp.*, 957 P.2d 767, 771 (Wash. Ct. App.

ORDER - 5

Here, Plaintiff alleges that Mr. Williamson singled him out for negative treatment on the basis of his national origin. According to Plaintiff's allegations, Mr. Williamson: (1) encouraged him to take his time on a preliminary test, then criticized him for taking too long, and ultimately, grabbing the test papers and leaving him (Am. Compl. ¶ 3.6(a)); (2) told him, "Maybe you shouldn't be here" after Plaintiff showed up late for the first day of the session and explained that he was on medication for his bipolar affective disorder (Ayon Affid. ¶ 6); (3) repeatedly singled him out in front of the class and commented that he wasn't learning enough and was probably going to fail (*id.* ¶ 7); (4) repeated references to the "Mendoza line" (*id.* ¶ 7); (5) a comment that his car salesman, Juan, was never going to succeed (*id.* ¶ 7); (6) scolded him for protesting about the use of the "Mendoza line" phrase and instructing him that he was to nod and smile every time Mr. Williamson used it (*id.* ¶ 8); and (7) asked Plaintiff to play the role of a failing sales representative in a role-playing exercise (*id.* ¶ 10). The cumulative effect of these alleged acts caused Plaintiff to feel such stress that he left the training session early and without completing the last assignment. Plaintiff claims that his experience at the St. Louis training triggered his breakdown. He also claims that Mr. Williamson's inaccurate and negative report about Plaintiff's performance at the training class caused him to be fired.

In order to make out a prima facie case of racial harassment, Plaintiff must show that he belongs to a protected class and that he was treated less favorably than a similarly situated non-protected employee who was doing substantially the same work. *Johnson v. Dep't of Soc. & Health Servs.*, 907 P.2d 1223, 1232 (Wash. Ct. App. 1996). Here, there is no dispute that Plaintiff belongs to a protected class. Plaintiff's allegations of how he was treated,[2] largely undisputed by Defendants,[3] raise a genuine issue of material fact

---

1998). *Compare Zwink v. Burlington Northern, Inc.*, 536 P.2d 13, 17 (Wash. Ct. App. 1975) (stating that the defendant railroad was liable for the acts and omissions of a flagman acting within the scope of his employment, without reference to whether the flagman had been found to be "liable").

[2] Defendant QP3 argues that Plaintiff's statements about how he was treated by Mr. Williamson should be excluded from consideration as irrelevant. However, QP3 makes this argument in the context of its motion, which concentrates almost entirely on whether QP3 can properly be held liable under the WLAD.

ORDER - 6

as to whether Plaintiff was subjected to discriminatory treatment by Mr. Williamson on the basis of his race.

The next, more complicated, question is how and whether QP3 may be held responsible for Mr. Williamson's alleged conduct. First, Plaintiff does not dispute that Mr. Williamson was not actually QP3's employee. Mr. Williamson was "leased" from an employment agency. However, Mr. Williamson has performed work exclusively for QP3 since 2001. (Williamson Dep. 8:20.) He performs training services for QP3, developing the classes as well as teaching them. (*Id*. 26:12.)

Under Washington law, a party may be held liable for the actions of an independent contractor if that party, the principal, retains the right to control the manner and means of work. *DeWater v. State of Washington*, 921 P.2d 1059, 1064 (Wash. 1996). Alternatively, a principal may be held liable for the unauthorized acts of an agent who is acting on the principal's behalf. *McGrane v. Cline*, 973 P.2d 1092, 1095 (Wash. Ct. App. 1999) (citing *Niece v. Elmview Group Home*, 929 P.2d 420, 425–26 (1997)). "However, when an agent steps aside from a principal's purposes in order to pursue a personal objective of the agent, the principal is not liable." *Id*.

In the present case, there is very little evidence on the record pertinent to this question as applied to QP3's relationship to Mr. Williamson. The record shows only that QP3 did not pay Mr. Williamson's wages directly, did not pay him health insurance or workers' compensation benefits, and did not issue tax documents for him. However, the nature of Mr. Williamson's work suggests that QP3 had near total control over the manner and means of Mr. Williamson's work. Because the record does not contain enough evidence upon which the Court may make a definitive finding as to whether QP3 may be held responsible

---

[3] Defendants also appear to argue that Mr. Williamson's use of the term "Mendoza line" was neither itself negative nor was it applied in any negative context. As this is hotly disputed by Plaintiff and supported by his testimony at his deposition and by the statements in his affidavit, the way in which Mr. Williamson employed the term "Mendoza line" is a material fact that remains to be determined at trial.

for Mr. Williamson's actions, the Court finds that there is a genuine issue of material fact remaining for trial as to this question.

If the facts establish that QP3 is responsible for Mr. Williamson's conduct, it may be liable to Plaintiff for the damages established to have resulted from that conduct.

In addition, Plaintiff may state a WLAD claim against QP3. Under WLAD, "employer" is defined in relevant part as "any person acting in the interest of an employer . . . who employs eight or more persons." WASH. REV. CODE § 49.60.040(3). "Person," in turn, is defined as "one or more individuals, partnerships, associations, organizations, corporations, cooperatives, legal representatives . . . or any group of persons." Although the actual language of WLAD's definition of "employer" could be interpreted to mean that the "person" referred to must employ eight or more people, case law interpreting this definition has made it clear that this is not how the statute is to be interpreted. Rather, the entity required to employ eight or more people is the employer referred to by the second appearance of that word, not the "person acting in the interest." *See Brown v. Scott Paper Worldwide Co.*, 20 P.3d 921, 926 (Wash. 2001) (addressing this very question).

Therefore, the determination to be made is whether QP3 was "acting in the interest" of Lincare within the meaning of the WLAD. As the parties did not brief this issue fully, and as the record does not contain much information pertinent to the issue, the Court finds that there is a genuine issue of material fact remaining for trial.[4]

In sum, Defendant QP3's motion is GRANTED as to Plaintiff's negligent hiring and negligent supervision claims, and DENIED as to Plaintiff's vicarious liability and WLAD claims.

---

[4] Although QP3 argues that it exercises no control over its clients' employees and makes no recommendations to its clients as to their employees, QP3 concedes that it grades seminar attendees' performance at the seminars and provides this information to employers with the knowledge that this information is then used to make employment-related decisions. If it turns out that QP3 or an individual whose actions it is responsible for discriminated against Plaintiff (thus generating false and inaccurate data about Plaintiff), then QP3's role in Plaintiff's termination is sufficient to impose liability.

ORDER - 8

C. *Defendant Lincare*

Plaintiff seeks to hold Defendant Lincare accountable for its alleged failure to accommodate his disability (bipolarity) and for Ed Williamson's allegedly discriminatory conduct at the St. Louis training session.

1. *Discrimination on the basis of national/ethnic origin*

With respect to Lincare's liability for Mr. Williamson's conduct, Lincare may be held liable for either Defendant QP3 or Mr. Williamson's behavior (or both), under the same legal principles as discussed above for QP3. The evidence on the record shows that the training program for Lincare's employees was developed jointly by Lincare and QP3 (both Mr. Anderson and Mr. Williamson were involved). However, as with the relationship between Mr. Williamson and QP3, there is insufficient information in the record now before the Court upon which the Court may make a definitive determination as to the precise nature of the Lincare-QP3 and the Lincare-Williamson relationship. It may be that Lincare may be liable for Mr. Williamson's actions through Lincare's and Mr. Williamson's relationship to QP3 (QP3 as a "bridge") or it could be that Lincare may be liable for Mr. Williamson's actions because of Lincare's own control over the manner and means of Mr. Williamson's work.

Accordingly, the Court cannot determine, as a matter of law, that Lincare may escape vicarious liability for Mr. Williamson's alleged conduct.

Similarly, with respect to Plaintiff's WLAD claim, Mr. Williamson may be a person who "acted in the interest" of Lincare. Contrary to Defendant Lincare's assertion, *Brown v. Scott Paper Worldwide* does not limit its holding to supervisors who are also employees of the ultimate employer. Indeed, a subsequent case discussing whether *Brown* meant that liability could attach to non-supervisory employees determined that the question could not be answered in the context of that case because the facts did not show that the individual in question was "acting in the interest" of his employer. *Jenkins v. Palmer*, 66 P.3d 1119, 1121

ORDER - 9

(Wash. Ct. App. 2003). Here, as in *Jenkins*, the factual development of this issue is insufficient for the Court to determine whether Mr. Williamson may properly be considered to have been acting in the interest of Defendant Lincare.

Defendant Lincare also argues that Plaintiff cannot make a prima facie showing of racial discrimination. Specifically, Lincare argues that Plaintiff cannot show that he was treated less favorably than a similarly situated non-protected employee who was doing substantially the same work because Plaintiff performed poorly at the St. Louis training session. However, the parties dispute not only what actually happened at the St. Louis training, but also whether what happened there was accurately reported back to Lincare by Mr. Williamson. Accordingly, the Court cannot find as a matter of law that Plaintiff cannot make out a prima facie case of racial discrimination.

Lincare argues, in the alternative, that even if Plaintiff has made an adequate prima facie showing, that Lincare had a legitimate non-discriminatory reason for Plaintiff's discharge. In support of this argument, Lincare points out again that Plaintiff failed to complete the sales training course. However, if Plaintiff's failure to complete the sales training course (and/or his poor performance) was due to grievously unfair treatment of Plaintiff on the basis of his race or ethnicity, Plaintiff's failure to complete the course cannot serve as a proper basis for his discharge. Therefore, until the facts of what happened at the training session are established, Lincare may not rely on Plaintiff's failure to complete the course as a nondiscriminatory reason for his discharge.

Lincare also argues that it may employ the after-acquired evidence doctrine with respect to its recent discovery that Plaintiff may have misrepresented his educational background.[5] Contrary to Lincare's assertion, the after-acquired evidence doctrine cannot operate to shield Lincare entirely from liability. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360–63 (1995). Rather, it may limit

---

[5] Lincare's other allegation, that Plaintiff engaged in company-prohibited conduct by taking his wife with him on at least one home visit, is disputed and will therefore not be considered.

ORDER - 10

Plaintiff's available relief. However, before after-acquired evidence may provide relief to the employer, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id*. at 362–63.

The record now before the Court simply does not provide the Court with sufficient information to conclude that (1) Plaintiff did not "graduate" from high school, or that (2) Defendant Lincare would have terminated him. First, Plaintiff asserts that he completed all of his course work, but that he did not officially graduate from high school because he left school early in order to start work. Defendant's response to this assertion is that "[i]t is not reasonable to believe that Plaintiff could have completed all his final exams, as he claims, four months prior to graduation." (Lincare's Reply 5.) There is simply no factual basis for this statement. If the facts are as Plaintiff claims, and he *completed* high school without *graduating*, it is not clear whether his representation that he "graduated" would have been sufficient grounds for Defendant to terminate him. Even if Plaintiff did *not* complete his coursework, Defendant's assertions that a misrepresentation regarding his education would have certainly resulted in his termination are insufficient grounds for the Court to make a finding at this time.[6] Accordingly, Defendant Lincare is not entitled to a finding that its after-acquired evidence regarding Plaintiff limits its potential liability.

In sum, Defendant Lincare's motion is DENIED with respect to Plaintiff's vicarious liability, respondeat superior and WLAD claims.

---

[6] Mark Schuetzler's declaration is not entirely credible. He represents that Plaintiff took his wife on a trip in a company van. However, this statement is not based on his personal knowledge. Plaintiff asserts that the trip on which his wife accompanied him occurred prior to his employment with Defendant Lincare. Given Mr. Schuetzler's possible inaccuracy with respect to this critical episode, the Court is disinclined to accept Mr. Schuetzler's statements as sufficient evidence for a summary judgment ruling in Lincare's favor on the subject of Plaintiff's educational background.

ORDER - 11

### 2. *Failure to accommodate*

The WLAD "forbids an employer from discharging an employee because of the presence of any sensory, mental, or physical disability." *McClarty v. Totem Elec.*, 137 P.3d 844, 848 (Wash. 2006). "An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim; an employer who fails to accommodate the employee's disability, faces an accommodation claim." *Id.* (citing *Pulcino v. Federal Express Corp.*, 9 P.3d 787, 793 (Wash. 2000)). Under WLAD, "[a]n employer's failure to reasonable accommodate the sensory, mental, or physical limitations of a disabled employee constitutes discrimination unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer's business." *Pulcino*, 9 P.3d at 793. An employer's duty to accommodate is triggered by an employee's notice to the employer of his or her disability. *Id.* at 795.

> [T]he employer's duty to determine the nature and extent of the disability does not impose an investigatory duty to question any employee suspected of a disability. The employer's duty to inquire only arises after the employee has initiated the process by notice and extends only to assuring the employer sufficient information to accommodate the disability.

*Goodman v. Boeing Co.*, 899 P.2d 1265, 1270 (Wash. 1995). The employee's notice to the employer must include the nature of the "abnormality" and "its accompanying substantial limitations." *Riehl v. Foodmaker*, 94 P.3d 930, 934 (Wash. 2004).

Here, Plaintiff's papers allege that the subject of his bipolar disorder arose twice. The first time was during the training session in St. Louis, when Plaintiff overslept and arrived late for the first day of class. Plaintiff claims that he apologized to Ed Williamson and told him that he was on medications to control his bipolar affective disorder. (Ayon Affid. ¶ 6.) The second time was when Plaintiff's doctor wrote to Lincare on Plaintiff's behalf, asking that Plaintiff be reinstated. (*See* Garrett Affid.) Defendant appears to contend that it never received this letter. (*See* Lincare's Reply 3 n.2 (stating that Dr. Sanchez's note is not part of Plaintiff's personnel file).)

Regardless of whether Lincare received Dr. Sanchez's letter, the Court finds that Dr. Sanchez's letter does not contain enough information to constitute proper notice to Lincare of Plaintiff's disability. The letter states only:

> While he was attending his training in Saint Louis, Missouri he found himself overwhelmed and fled that program. Mr. Ayon's situation left him no other alternative than to leave the training early to obtain medical intervention. . . .Mr. Ayon would like your consideration in returning to work with your company. Since his employment interruption he has done an excellent job at managing his symptoms.

(Sanchez Ltr. (July 9, 2002).) This information does not inform Lincare about the *nature* of Plaintiff's disability or about the accommodations Plaintiff might need. A reasonable person would not even necessarily read the letter to mean that Plaintiff suffers from a disability, since it treats Plaintiff's "situation" as a one-time occurrence. Accordingly, the Court does not find that Dr. Sanchez's note (if received by Defendant Lincare) could constitute notice of Plaintiff's disability and of his need for accommodation.

Plaintiff's claim that he told Mr. Williamson about his bipolar affective disorder is similarly insufficient. Indeed, Plaintiff states in his declaration that after he informed Mr. Williamson of his disability, and after Mr. Williamson suggested, "Maybe you shouldn't be here," Plaintiff assured Mr. Williamson that he would be fine. (Ayon Affid. ¶ 6.) In other words, Plaintiff effectively told Mr. Williamson that he did not require any accommodation. Accordingly, assuming without finding that Mr. Williamson could have been obliged to accommodate Plaintiff's disability, the Court finds that Plaintiff's "notice" to Mr. Williamson does not constitute notice sufficient to trigger any responsibility to accommodate.

The Court finds that Plaintiff has not shown that there is any genuine issue of material fact as to whether Lincare was notified of Plaintiff's disability. Because Lincare was never notified of Plaintiff's disability, its obligation to accommodate Plaintiff was never triggered. Accordingly, the Court finds as a

ORDER - 13

matter of law that Lincare did not fail to accommodate Plaintiff in violation of the WLAD, and Lincare's motion for summary judgment is GRANTED as to Plaintiff's accommodation claim.

IV. CONCLUSION

In accordance with the foregoing, Defendant QP3's motion is GRANTED as to Plaintiff's negligent hiring and negligent supervision claims, and DENIED as to Plaintiff's vicarious liability and WLAD claims. Defendant Lincare's motion is GRANTED as to Plaintiff's accommodation claim and DENIED as to Plaintiff's vicarious liability, respondeat superior and WLAD claims.

_____
UNITED STATES DISTRICT JUDGE

ORDER - 14